IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>v.<br>**ROBERT BRANDON MILLER** | **CRIMINAL NO.  23-135** |

MEMORANDUM OPINION

**Rufe, J.**                                                                                                        **January 10, 2024**

Defendant Robert Brandon Miller is charged in a single-count indictment with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Defendant has filed a motion to suppress the firearm and subsequent statements he made to law enforcement officials. Upon consideration of Defendant's Motion to Suppress, the government's response thereto, and the evidence, testimony, and oral argument presented at a hearing held on December 18, 2023, and upon further review of the hearing transcripts, the Court now enters its findings of fact and conclusions of law.

I.      FINDINGS OF FACT

1.  At the time of the incident, Officer Joseph Yocum was employed as a patrol officer for the City of Chester Police Department. That police department does not have body-worn cameras or mounted-dash cameras.[1]

2.  On Friday, July 29, 2022, at approximately 3:00 p.m., Officer Yocum observed a black Kia Optima driving westbound through the intersection of West 7th and Kerlin Streets. All of the vehicle's windows were heavily tinted, which prevented Officer Yocum from seeing inside the car and was in violation of Pennsylvania law.[2]

---

[1] Suppression Hr'g Tr. ("Hr'g Tr.") [Doc. No. 31] at 11.

[2] Hr'g Tr. 12–13.

3. Officer Yocum activated his police lights. The Kia slowed down, but continued driving for approximately 30 seconds before coming to a complete stop.[3] After the car stopped, Officer Yocum observed the vehicle bouncing up and down, as if the passengers inside were moving.[4] Officer Yocum noted that the stop occurred in a high-crime area.[5]

4. Officer Yocum exited his police vehicle and approached the passenger side of the Kia Optima. The passenger side window rolled down. Mr. Miller was in the driver's seat and Dajanke Green-Money, the owner of the vehicle, was in the front passenger seat. Brian Lowrie was located behind Ms. Green-Money in the rear passenger seat.[6] Officer Yocum smelled an odor of marijuana coming from the car.[7]

5. Officer Yocum told Mr. Miller that he stopped the car due to the heavily tinted windows and requested his driver's license. Mr. Miller stated that he did not have a valid driver's license.[8] While Officer Yocum was standing on the passenger side of the car, Mr. Lowrie was blowing smoke from a cigarette or "Black & Mild" out of a crack in the back passenger-side window.[9]

6. Officer Yocum testified that Mr. Miller appeared nervous and was sweating.[10] Officer Yocum looked at Mr. Miller and asked him to exit the car and walk to the passenger side of the vehicle while he ran his information through the National Crime Information

---

[3] Hr'g Tr. 14.
[4] Hr'g Tr. 15.
[5] Hr'g Tr. 19.
[6] Hr'g Tr. 15–17.
[7] Hr'g Tr. 18.
[8] Hr'g Tr. 17.
[9] Hr'g Tr. 17.
[10] Hr'g Tr. 18.

Center index ("NCIC"). In response, Mr. Miller said, "Who me?" Officer Yocum told Mr. Miller that he was in fact asking him to step out of the car.[11] When Mr. Miller exited the car, Officer Yocum conducted a pat down of his person.[12]

7. After running the information through NCIC and confirming that Mr. Miller's license was suspended, he asked Mr. Miller for consent to search the vehicle. Mr. Miller told Officer Yocum that he did not own the vehicle and that Officer Yocum would need to ask Ms. Green-Money for consent to search the car. Officer Yocum posed a hypothetical and asked Mr. Miller, "if it were up to [you], would [you] provide me with consent[?]" In response, Mr. Miller replied that he would.[13] By this point, two other officers had arrived at the scene.[14]

8. Afterwards, Officer Yocum asked Ms. Green-Money for identification. He asked Ms. Green-Money to step out of the Kia Optima.[15] As they were standing on the sidewalk, Officer Yocum told Ms. Green-Money that Mr. Miller appeared nervous and he smelled marijuana. Officer Yocum asked for consent to search the car. Ms. Green-Money did not immediately provide consent. Officer Yocum explained that she could refuse consent. Ms. Green-Money then provided consent to search the vehicle.[16] No consent-to-search forms were signed.[17]

---

[11] Hr'g Tr. 18.
[12] Hr'g Tr. 19.
[13] Hr'g Tr. 20.
[14] Hr'g Tr. 19.
[15] Hr'g Tr. 21.
[16] Hr'g Tr. 21–22.
[17] Hr'g Tr. 39.

9. Officer Yocum searched the vehicle for approximately five minutes. Officer Yocum located a black gun laser attachment on the back seat. Officer Yocum lifted the seat and found a quantity of marijuana, cocaine, and fentanyl. Officer Yocum then located a loaded black Glock 23 firearm in a compartment directly under the steering wheel.[18] It took approximately fifteen minutes from the time the traffic stop was initiated to the recovery of the firearm.[19]

10. Officer Yocum testified that after arresting Mr. Miller and transporting him to the police station, Mr. Miller and Officer Yocum stood in the sally port area of the police station as Mr. Miller smoked a cigarette.[20] Mr. Miller had not been read his *Miranda* warnings. According to Officer Yocum's testimony, Mr. Miller said that the gun was his and he did not want his girlfriend, Ms. Green-Money, to get in trouble.[21] Officer Yocum testified that Mr. Miller declined to give a formal interview.[22] The Court notes that Officer Yocum so testified, but the Court does not make a finding as to whether the statement was made.

11. On April 5, 2023, at approximately 10:30 a.m., ATF special agents arrested Mr. Miller at the George W. Hill Correctional Facility, where he was being held on state firearm violations. Mr. Miller waived his *Miranda* rights and provided the agents with a statement admitting he possessed the firearm in question.[23]

---

[18] Hr'g Tr. 23.

[19] Hr'g Tr. 25.

[20] Hr'g Tr. 26.

[21] Hr'g Tr. 26-27.

[22] Hr'g Tr. 73–74.

[23] Def.'s Mot. Suppress [Doc. No. 15] at 3, 18; Gov't Resp. Opp'n Mot. Suppress [Doc. No. 22] at 4–5.

## II.  DISCUSSION OF APPLICABLE LAW

Mr. Miller argues that the firearm found in the car should be suppressed because it was recovered during the "unlawful extension of a routine traffic stop," and he further argues that his oral statements should be suppressed "as the tainted fruits of this unlawful traffic encounter."[24] In order to suppress evidence, the defendant has the burden of establishing that his Fourth Amendment rights were violated.[25] "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."[26] The burden of proof is preponderance of the evidence.[27]

A traffic stop, even if brief and for a limited purpose, "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."[28] Here, neither party disputes that the stop was lawful at its inception.[29] The issue before the Court is whether the stop, though "lawful at its inception" was unreasonably extended in violation of the Fourth Amendment.[30]

In *Rodriguez v. United States*, the Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."[31] A seizure remains lawful only "so long as [unrelated] inquiries

---

[24] Def.'s Mot. Suppress [Doc. No. 15] at 3.

[25] *United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992).

[26] *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted).

[27] *United States v. Mastronardo*, 987 F. Supp. 2d 569, 575 (E.D. Pa. 2013) (citing *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)).

[28] *Whren v. United States*, 517 U.S. 806, 809–10 (1996); *see also United States v. Clark*, 902 F.3d 404, 409 (2018).

[29] *See* Pennsylvania Motor Vehicle Code (MVC), 75 Pa.C.S. § 4524(e) ("No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle.").

[30] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also Clark*, 902 F.3d at 409.

[31] 575 U.S. 348, 350 (2015).

do not measurably extend the duration of the stop."[32] The officers "may exercise reasonable superintendence over the car and its passengers," and have the discretion to order the driver and passengers to get out of the vehicle.[33] An officer's mission during the traffic stop includes determining whether to issue a ticket and other "ordinary inquiries incident to" the stop such as checking the driver's license, determining whether the driver has outstanding warrants, and checking vehicle registration and proof of insurance.[34]

In light of *Rodriguez*, the Third Circuit has articulated a two-step approach for evaluating if a traffic stop violates the Fourth Amendment.[35] First, the Court must "determine when the stop was 'measurably extend[ed]'" AKA the "*Rodriguez* moment."[36] The Third Circuit explained that this rule is "easier to articulate than to apply" and that "determining when a traffic stop is 'measurably extended' is more difficult than *Rodriguez*'s language might suggest."[37] Second, the Court must determine "whether, at [the] presumed 'Rodriguez moment,'" the officer possessed reasonable suspicion of criminal activity.[38]

### A. The *Rodriguez* Moment

The Court must first determine the "*Rodriguez* moment" of the stop, *i.e.*, the moment that the officer detoured from the traffic-based mission of the stop. Mr. Miller argues that the "*Rodriguez* moment" occurred after Officer Yocum determined that the window tint violated

---

[32] *Id.* at 355.

[33] *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citations omitted).

[34] *Rodriguez*, 575 U.S. at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)).

[35] *United States v. Green*, 897 F.3d 173 (3d Cir. 2018).

[36] *Id.* at 179.

[37] *Id.*

[38] *Id.* at 182–83; see also *United States v. Garner*, 961 F.3d 264, 270 (3d Cir. 2020).

Pennsylvania's motor vehicle code and after Mr. Miller volunteered that his driver's license was suspended, since there was "no longer any basis to detain him."[39] The government does not clearly articulate what they believe to be the "*Rodriguez* moment," but instead contends generally that there was reasonable suspicion for the fifteen-minute stop.[40]

After running Mr. Miller's information through NCIC, Officer Yocum proceeded to ask Mr. Miller (and later Ms. Green-Money) for consent to search the car. As the Third Circuit has explained:

> Not all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission. In particular, those "measure[s] aimed at detect[ing] evidence of ordinary criminal wrongdoing" do not pass muster. "On-scene investigation into other crimes . . . detours from th[e] mission," as do "safety precautions taken . . . to facilitate such detours." This is because "the Government's endeavor to detect crime in general or drug trafficking in particular" is different in kind than roadway and officer safety interests.[41]

After determining that the window tint violated Pennsylvania law and confirming that Mr. Miller was driving with a suspended license, Officer Yocum could have issued a ticket and ended the encounter after confirming that Ms. Green-Money had a valid license to drive the car. Instead, Officer Yocum continued the stop by asking Mr. Miller—and later Ms. Green-Money—if he could search the car.

While attending to safety concerns is a legitimate police inquiry, the Court finds that the continuation of the police encounter to acquire consent to search the vehicle was not based purely on safety concerns, but instead was to facilitate a detour into an on-scene investigation of

---

[39] Def.'s Mot. Suppress [Doc. No. 15] at 9.

[40] The Court of Appeals held in *United States v. Garner* that if the investigating officer had reasonable suspicion prior to the *Rodriguez* moment, then there is no Fourth Amendment violation. 961 F.3d 264, 271–72 (3d. Cir. 2020).

[41] *Clark*, 902 F.3d at 410 (citations omitted).

other crimes in general.[42] Erring on the side of caution, the Court holds that the "*Rodriguez* moment" was immediately after Officer Yocum ran Mr. Miller's information through NCIC, when Officer Yocum measurably extended the traffic stop by proceeding to ask Mr. Miller and then later Ms. Green-Money for consent to search the car.

### B. Reasonable Suspicion at the *Rodriguez* Moment

The Court must now determine whether the facts known to Officer Yocum at the "*Rodriguez* moment"—the time at which Officer Yocum asked Mr. Miller for consent to search the car immediately after checking his information through NCIC—were sufficient to establish reasonable suspicion that criminal activity was afoot, as required to justify extending the stop.[43]

Reasonable suspicion is more than "a mere hunch . . . [but] considerably less than . . . a preponderance of the evidence, and obviously less than . . . probable cause."[44] In analyzing whether there was reasonable suspicion, the Court: (1) must look to the totality of the circumstances; (2) must recognize "the particular ability of law enforcement officers, based on training and experience, 'to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person"'"; and (3) should not engage in a "divide-and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each.[45] Only information known to

---

[42] The Court notes that some of the safety concerns asserted by the government are overstated. For example, the government contends that this traffic encounter occurred "at night in an area that they knew to feature frequent episodes of violent crime." *See* Gov't Resp. Opp'n Mot. Suppress [Doc. No. 22] at 7. However, Officer Yocum clearly testified that the stop occurred at 3:00 in the afternoon. *See* Hr'g Tr. 36.

[43] In *Rodriguez*, the Supreme Court held that even *de minimis* extensions of a traffic stop for "unrelated inquiries" are unlawful if not supported by reasonable suspicion. *See Rodriguez,* 575 U.S. at 355; *see also United States v. Hurtt*, 31 F.4th 152, 160 (3d. Cir. 2022). Therefore, it is immaterial to the constitutional analysis that the time between Mr. Miller being pulled over to the eventual recovery of weapons was only 15 minutes.

[44] *Green*, 897 F.3d at 183 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).

[45] *Id*.

the officer at the time of the stop may be consulted in determining whether there was reasonable suspicion,[46] and the officer must be able to point to some "objective manifestation" that criminal activity was afoot.[47] "Courts give considerable deference to police officers' determinations of reasonable suspicion."[48] The Third Circuit has explained that, "[a]fter a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation."[49]

    First, the Court notes inconsistencies with Officer Yocum's testimony at the suppression hearing, his prior testimony at the preliminary hearing in state court, and in the incident report. In the hearing before this Court, Officer Yocum testified that Mr. Miller, while he was in custody in the sally port area of the police station smoking a cigarette, made an un-*Mirandized* statement that the gun was his. However, at Mr. Miller's state court preliminary hearing, less than three months after the incident, Officer Yocum testified that he did not recall Mr. Miller making any statements to him.[50] In Officer Yocum's narrative in the incident report (from the date of the incident), Officer Yocum did not make any mention of the fact that Mr. Miller told him the gun was his. These inconsistencies detract from Officer Yocum's overall credibility.[51] However, on

---

[46] *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).

[47] *Johnson v. Campbell,* 332 F.3d 199, 206 (3d Cir. 2003) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

[48] *United States v. Mosley*, 454 F.3d 249, 252 (3d. Cir. 2006).

[49] *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003).

[50] D-6 at 11; *see also* Hr'g Tr. 41.

[51] *See United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (listing the witness's ability to accurately recollect the matters at hand as a factor to consider in assessing credibility).

the specific observations from the traffic stop itself, Officer Yocum has provided a consistent narrative of the encounter.

As the Court has found above, Officer Yocum testified to multiple factors that contributed to his suspicion within the first few minutes of the stop. After the officer initiated his lights, the vehicle continued to slowly roll for about 30 seconds before coming to a complete stop and then appeared to be "bouncing up and down" when Officer Yocum approached the vehicle, indicating that the occupants may have been concealing something as the car slowly rolled down the street and when the car was seen bouncing up and down. Officer Yocum also testified that the stop for the vehicle code infraction occurred in a "high-crime area."[52]

Once Officer Yocum approached the car, he "observed an odor of marijuana coming from the vehicle."[53] After the officer asked Mr. Miller for his license and registration, Mr. Miller informed Officer Yocum that he was driving with a suspended license.[54] The officer observed Mr. Miller to be nervous and sweating. The officer—staring directly at Mr. Miller—asked him to exit the vehicle and walk to the patrol car while he ran the NCIC information. Mr. Miller asked "who me?" in a confused manner. Officer Yocum testified that Mr. Miller spoke in a "low voice, almost like under his breath" and was "gulping water out of a cup while he was trying to talk."[55] These are all factors that would lead an officer based on his training and experience to conclude that criminal activity was afoot.

---

[52] *See* Gov't Resp. Opp'n Mot. Suppress [Doc. No. 22] at 7.

[53] Hr'g Tr. 18.

[54] At the very least, this means that the officer would have needed to extend the stop to confirm that one of the two other occupants of the car had a valid license to drive the car after the traffic stop.

[55] Hr'g Tr. 18.

Mr. Miller takes issue with these factors individually. First, Mr. Miller argues that nervous behavior alone is insufficient to establish reasonable suspicion.[56] Mr. Miller also points to the heightened nervousness that many African Americans face during police conduct due to the long-fraught history of tension between police and Black citizens.[57] "A court must be careful to differentiate mere nervousness from suspicious, furtive behavior or specific observations that lead an officer to believe that a suspect is engaging in criminal activity."[58] Here, Officer Yocum made specific observations about Mr. Miller's nervous behavior in conjunction with his additional observations that (1) there was an odor of marijuana, (2) the car slowly rolled for 30 seconds, as opposed to pulling over and stopping, and (3) the car was bouncing up and down as he approached. Taking all of the circumstances together, reasonable suspicion did not arise solely based on Mr. Miller's nerves.

Second, Mr. Miller argues that window tint cannot support a reasonable belief that the car owner is engaged in criminal activity.[59] While window tint alone may not support a reasonable suspicion determination, this was not the only factor in Officer Yocum's determination that criminal activity may have been afoot. Lastly, Mr. Miller cites the Pennsylvania Supreme

---

[56] Def.'s Mot. Suppress [Doc. No. 15] at 11; *see also United States v. Alvin*, 701 F. App'x 151, 155 (3d. Cir. 2017) ("[I]t is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer.").

[57] Def's Mot. Suppress [Doc No. 15] at 11. Mr. Miller cites to Justice Sotomayor: "For generations, black and brown parents have given their children 'the talk' – instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger – all out of fear of how an officer with a gun will react to them." *See Utah v. Strieff*, 579 U.S. 232, 254 (2016) (Sotomayor, J., dissenting) (citing W.E.B. Du Bois, *The Souls of Black Folk* (1903); J. Baldwin, *The Fire Next Time* (1963); T. Coates, *Between the World and Me* (2015)). Recently, Judge McKee also articulated the disparate treatment that drivers of color face at the hands of police officers. *See United States v. Hunter*, 88 F.4th 221, 227 (3d. Cir. 2023) (McKee, J., concurring) ("studies have shown that police tend to subject motorists of color to more burdensome procedures than their White counterparts.").

[58] *United States v. Harrison*, 2018 WL 4405892, at *9 (E.D. Pa. Sept. 17, 2018).

[59] Def.'s Mot. Suppress [Doc. No. 15] at 13.

Court's holding that "the odor of marijuana may be a factor, but not a stand-alone one, in evaluating the totality of the circumstances for purposes of determining whether police had probable cause to conduct a warrantless search."[60] However, the government does not cite marijuana as a "stand-alone" factor in its reasonable suspicion analysis. Most importantly, in the Third Circuit, "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause."[61]

Although individually each factor may not rise to the level of reasonable suspicion, district courts must not conduct a "divide and conquer analysis."[62] Each factor will not be "viewed in isolation" because "plausible, innocent explanations are offered for each."[63] Taking the factors together and granting the required "considerable deference to police officers' determinations of reasonable suspicion,"[64] the Court concludes that Officer Yocum possessed objective, reasonable suspicion to extend the stop by asking Mr. Miller and Ms. Green-Money for consent to search the car. Therefore, since Officer Yocum had reasonable suspicion of criminal activity at the time that he deviated from the initial mission of the stop, there was no Fourth Amendment violation and the evidence resulting from the stop will not be suppressed.

### C. Ms. Green-Money's Consent

Mr. Miller also argues that the government cannot prove Ms. Green-Money's consent to search the car was voluntary. A search conducted pursuant to consent is one of the exceptions to

---

[60] *Commonwealth v. Barr*, 266 A.3d 25, 41 (Pa. 2021).

[61] *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). *Ramos* has recently been cited by multiple district courts. *See, e.g., United States v. Morris*, 2023 WL 5607970, at *8 (W.D. Pa. Aug. 30, 2023); *United States v. Sepulveda*, 2023 WL 4139023, at *3 (E.D. Pa. June 22, 2023).

[62] *Green*, 897 F.3d at 183 (citing *District of Columbia v. Wesby*, 583 U.S. 48, 62 (2018)).

[63] *Id*.

[64] *Mosley*, 454 F.3d at 252.

the Fourth Amendment's warrant requirement.[65] The voluntariness of an individual's consent "is a question of fact to be determined from the totality of all the circumstances."[66] The Court must look to the "setting in which the consent was obtained, what was said and done by the parties present with particular emphasis on what was said by the individual consenting to the search, and [her] age, intelligence and educational background."[67]

Similar to the facts in *United States v. Givan*, Ms. Green-Money gave her consent while standing on the side of the road in broad daylight.[68] She was not detained or handcuffed. Officer Yocum informed Ms. Green-Money that she did not need to provide consent. There is no indication that Ms. Green-Money's age, intelligence, or educational background in any way limited her ability to provide voluntary consent. By applying the totality of the circumstances test, the Court concludes that Ms. Green-Money's consent was voluntary.

### D. Mr. Miller's Statement in the Sally Port Area

Custodial interrogation must be preceded by *Miranda* warnings, and "statements obtained in violation of these . . . rules may not be used by the prosecution in its case-in-chief."[69] Officer Yocum testified that he and Mr. Miller stood in the sally port area of the police station as Mr. Miller smoked a cigarette. According to Officer Yocum, Mr. Miller told him that the gun was his. At that time, Mr. Miller had not been read his *Miranda* warnings. The government correctly

---

[65] *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973).

[66] *Givan,* 320 F.3d at 459 (quoting *Schneckloth,* 412 U.S. at 227).

[67] *U.S. ex rel. Harris v. Hendricks*, 423 F.2d 1096, 1099 (3d. Cir. 1970).

[68] *See Givan,* 320 F.3d at 459.

[69] *Vega v. Tekoh*, 597 U.S. 134, 141–142 (2022).

concedes that *Miranda* warnings were required. Therefore, the government may not use any of these alleged statements in their case-in-chief.

However, a voluntary statement suppressed under *Miranda* may be used for impeachment purposes.[70] Defendant has not contested that the statement in the sally port area occurred. Assuming that any statement made was in the manner in which Officer Yocum testified, it was voluntary. Officer Yocum testified that he did not ask Mr. Miller any specific questions or coerce him into making a statement.[71] Instead, Officer Yocum testified that he and Mr. Miller engaged in a "casual" conversation before entering the station. Although such a conversation was prior to Mr. Miller receiving *Miranda* warnings, there is no showing that any statement made in the sally port area was involuntary. Therefore, any statements that Mr. Miller made in the sally port area may be used for impeachment purposes. Since the initial stop and subsequent seizure were not in violation of the Fourth Amendment, this Court need not discuss the potential suppression of Mr. Miller's further statements to the ATF agents, as they were not the tainted fruits of an illegal seizure. Mr. Miller did not raise any additional claims that the statements given to the ATF agents were involuntary or that they did not provide proper *Miranda* warnings.

### III. CONCLUSIONS OF LAW

1. Officer Yocum had reasonable suspicion to continue the traffic stop by asking Mr. Miller and Ms. Green-Money for consent to search the car.

2. Ms. Green-Money provided voluntary consent to search the car.

---

[70] *Mincey v. Arizona*, 437 U.S. 385, 397–98 (1978); *see also Harris v. New York*, 401 U.S. 222, 226 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.").

[71] Hr'g Tr. 27.

3.     Officer Yocum's vehicle stop and subsequent search did not violate the Fourth Amendment.

4.     Any un-*Mirandized* statements made by Mr. Miller in the sally port area of the police station may not be used in the Government's case-in-chief, but may be admissible for impeachment purposes only.

5.     Mr. Miller's *Mirandized* and voluntary statements provided to the ATF agents were not the fruits of an unlawful stop or seizure.

## IV. CONCLUSION

For the foregoing reasons, Mr. Miller's Motion to Suppress is denied. An order will be entered.